# EXHIBIT A

Case 1:04-cv-01543-SLR    Document 17-3    Filed 04/08/2005    Page 1 of 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re : | Chapter 11 |
| ONCO INVESTMENT COMPANY, et al. : | Jointly Administered<br>Case No. 04-10558 (JBR) |
| Debtors. : | Hearing Date: July 27, 2004 at 9:30 a.m.<br>Objection Deadline: July 16, 2004 at 12:00 p.m. |

**OBJECTION OF THE AD HOC COMMITTEE OF SENIOR SECURED
NOTEHOLDERS TO FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE FOR THE JOINT PLAN OF
<u>REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION</u>
(Re Docket Nos. 1286-1288)**

The Ad Hoc Committee of Senior Secured Noteholders of Oglebay Norton Company (the "Ad Hoc Committee"), by and through its undersigned counsel, objects to the proposed First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Joint Plan of Reorganization of Debtors and Debtors in Possession, dated July 1, 2004 (the "Proposed Disclosure Statement"), filed by the above-captioned chapter 11 debtors (the "Debtors") because the Proposed Disclosure Statement fails to provide "adequate information" as required under Section 1125(b) of title 11 of the United States Code (the "Bankruptcy Code") with respect to the Debtors' proposed First Amended Joint Plan of Reorganization, dated July 1, 2004 (the "Plan"), and in support hereof, respectfully states as follows:

**I. PRELIMINARY STATEMENT**

1. The Proposed Disclosure describes a patently unconfirmable plan of reorganization, making its approval (and any subsequent solicitation of acceptances) a hollow and wasteful exercise. The Plan provides for a distribution of new common stock in reorganized Oglebay Norton Company ("Oglebay") to holders of Oglebay's 10% senior subordinated notes due February 1, 2009 ("Subordinated Notes"), but denies holders of Oglebay's senior secured notes due October 25, 2008 ("Senior Notes") amounts to which they are entitled pursuant to the

**Exhibit A**

subordination provisions of the indenture governing the Subordinated Notes (the "Subordinated Notes Indenture"). Moreover, the Plan fails to provide any mechanism for the turnover of property distributed, or to be distributed, to holders of Subordinated Notes ("Subordinated Noteholders") under the Plan to holders of Senior Notes ("Senior Noteholders") to effectuate their subordination rights. Thus, the Plan fails to enforce such subordination provisions, as required by Section 510(a) of the Bankruptcy Code, and thereby violates Section 1129(a)(1) of the Bankruptcy Code, requiring that a plan of reorganization comply with all applicable provisions of the Bankruptcy Code.

2.   In addition, the Plan cannot be confirmed because the members of the Ad Hoc Committee, who hold, or are investment advisors to holders of, over 75% of all outstanding Senior Notes in the aggregate, intend to vote against the Plan and the Plan does not satisfy the preconditions for "cram down" under Section 1129(b) of the Bankruptcy Code.

3.   The law in this Circuit and elsewhere is clear -- a court should not approve a proposed disclosure statement filed in support of a patently unconfirmable plan of reorganization. For that reason alone, the Court should disapprove the Proposed Disclosure Statement.

4.   Going beyond the defects in the Plan, however, the Proposed Disclosure Statement itself suffers from a host of inadequate or misleading disclosures. For example, there is no disclosure concerning the distributions which the Senior Noteholders are entitled to receive under the documents evidencing their claims or how certain distributions that might be required under the Plan will be funded. In addition, the Proposed Disclosure Statement contains misleading information erroneously suggesting that Senior Noteholders may receive 100% recoveries under the Plan.

5.   Thus, the Proposed Disclosure Statement falls far short of providing the "adequate information" required under Section 1125(b) and should, therefore, not be approved.

## II. BACKGROUND

6.   The Senior Notes were issued under a Senior Secured Note Purchase Agreement,

Exhibit A

dated as of October 25, 2002, among Oglebay, certain guarantors named therein, The 1818 Mezzanine Fund II, L.P., and other purchasers listed therein (as amended, the "Senior Notes Purchase Agreement"). The members of the Ad Hoc Committee hold, or act as investment advisors to holders of, over 75% of the outstanding Senior Notes.

7. The Subordinated Notes Indenture unambiguously provides for the subordination of Subordinated Noteholders' claims to those of Senior Noteholders. In particular, Article 11 of the Subordinated Notes Indenture (together with the definitions of terms used therein and any other provisions referred to therein, the "Subordination Provisions") provides for the subordination of the Subordinated Notes to all existing and future "Senior Indebtedness." Specifically, Article 11 provides that:

> The Company [Oglebay] covenants and agrees, and each Holder of [Subordinated] Notes, by its acceptance thereof, likewise covenants and agrees, that, to the extent and in the manner hereinafter set forth in this Article Eleven, the Indebtedness represented by the [Subordinated] Notes and the payment of the principal of, premium, if any, and interest on the [Subordinated] Notes are hereby expressly made subordinate and subject in right of payment as provided in this Article Eleven to the prior indefeasible payment and satisfaction in full in cash of all existing and future Senior Indebtedness.

Subordinated Notes Indenture (a copy of which is annexed as Exhibit "A" hereto) at § 11.01, p. 89.

8. As set forth in detail in paragraphs 31 through 43 of the Complaint filed herein as Adversary Proceeding No. 04-54122-JBR by certain members of the Ad Hoc Committee (a copy of which is annexed as Exhibit "B" hereto), the term "Senior Indebtedness" is defined to include all of the Debtors' obligations under the Senior Notes. In particular, both the "Early Prepayment Premium" (in this case, 18% of the outstanding Senior Notes) and the "Default Rate of Interest" (which is 2% greater than the otherwise applicable rate of interest under the Senior Notes), each as defined in the Complaint, are included within the definition of "Senior Indebtedness" and are, therefore, subject to the Subordination Provisions.

9. The rights of the Senior Noteholders under the Subordination Provisions in

bankruptcy are also quite clear. Section 11.02 of the Subordinated Notes Indenture ("Payment Over of Proceeds upon Dissolution, etc.") provides as follows:

> In the event of (a) any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, arrangement, reorganization or other similar case or proceeding in connection therewith, relative to the Company or to its creditors, as such, or to its assets, whether voluntary or involuntary ... (1) the holders of Senior Indebtedness shall be entitled to receive payment and satisfaction in full in cash of all amounts due on or in respect of all Senior Indebtedness, before the Holders of the [Subordinated] Notes are entitled to receive or retain any payment or distribution of any kind or character on account of principal of, premium, if any, or interest on the [Subordinated] Notes; and (2) any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to which the Holders [of Subordinated Notes] would be entitled but for the provisions of this Article Eleven shall be paid by the liquidating trustee or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness or their representative or representatives or to the trustee or trustees under any agreement under which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the Senior Indebtedness held or represented by each, to the extent necessary to make payment in full in cash of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution, or provision therefor, to the holders of such Senior Indebtedness.

Subordinated Notes Indenture at § 11.02, p. 90.

10. Thus, in the Debtors' chapter 11 cases, and under the Subordinated Notes Indenture, Senior Indebtedness (which includes the Early Prepayment Premium and interest at the Default Rate of Interest) must be paid and satisfied in full, in cash before Subordinated Noteholders may receive or retain any property from the Debtors in these bankruptcy cases..

11. The Subordination Provisions go on to provide a mechanism to undo any distributions made to Subordinated Noteholders or the indenture trustee for the Subordinated Notes (the "Subordinated Notes Trustee") in violation of the provisions set forth above. Section 11.02 of the Subordinated Notes Indenture provides that:

> In the event that, notwithstanding the provisions of this Section

> 11.02, the [Subordinated Notes] Trustee or the Holder of any [Subordinated] Note shall have received any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, including, without limitation, by way of set-off or otherwise, in respect of principal of, premium, if any, and interest on the [Subordinated] Notes before all Senior Indebtedness is paid in full in cash, then and in such event such payment or distribution shall be paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or other Person making payment or distribution of assets of the Company for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full in cash, after giving effect to any concurrent payment or distribution, or provision therefor, to or for the holders of Senior Indebtedness.

Subordinated Notes Indenture at § 11.02, p. 90.

12. The Proposed Disclosure Statement and Plan ignore the Subordination Provisions insofar as they relate to the Early Prepayment Premium and Default Rate of Interest. The claims of Senior Noteholders (which are classified in Class 3 in the Plan) are to receive the following treatment:

> Holders of Allowed Old Senior Secured Note Claims can elect on the Ballot to: (a) receive Cash in the amount of 104% of their original principal amount of Old Senior Secured Notes, plus accrued and unpaid interest at the non-default rate through the Effective Date, on the Effective Date; or (b) participate in the Litigation Reserve Option. In addition, each holder of an Allowed Senior Secured Note Claim [sic] may retain any amounts paid to it or on its behalf as adequate protection (and receive and retain any other amounts that as of the Effective Date are due as adequate protection under the First Final DIP Order or the Second Final DIP Order but not previously paid); *provided, however,* that the Debtors reserve the right to seek to have some or all of such amounts applied to the principal balance of a holder's Old Senior Secured Note Claim. The Allowed Claims of holders who elect the Litigation Reserve Option will be paid only upon the entry of a Final Order as a result of such litigation and will not accrue, and such holders will not be entitled to receive, interest after the Effective Date.

Plan at § III.C.1, p. 15. Under the Plan, "Litigation Reserve Option" means:

> an election by the holder of an Allowed Old Senior Secured Note Claim to litigate, among other things, its entitlement to a prepayment premium and default interest in the Bankruptcy Court,

> pursuant to, among others, the adversary proceeding complaint
> filed by MW Post Portfolio Fund Ltd., *et al.*, on June 24, 2004,
> captioned MW Post Portfolio Fund Ltd., *et al.* v. Norwest Bank
> Minnesota, National Association, n/k/a Wells Fargo, MN, National
> Association, *et al.* (D.I. 1246), and to receive Cash in the amount
> allowed by a Final Order as a result of such litigation in full
> satisfaction of its Claim under the Plan.

Plan at § I.A.51, p. 5. Thus, under the Plan, Senior Noteholders will not receive all amounts owed to them, including, without limitation, the full Early Prepayment Premium and interest at the Default Rate of Interest through the date of payment (even if they do pursue, and prevail under, the Litigation Reserve Option).

13. Notably, even if a Senior Noteholder were to pursue the Litigation Reserve Option and win, there would be no assurance that the funds necessary to satisfy the claim would be available. All that the Plan says is that:

> [t]he amount necessary to satisfy the Claims of all holders
> participating in the Litigation Reserve Option will be guaranteed
> by an increase in the Rights Offering, a new rights offering **or
> some other mechanism** (other than the incurrence of debt by the
> Reorganized Debtors) that is mutually acceptable to the Debtors,
> the Reorganized Debtors and the Creditors' Committee.

Plan at § III.C.1, p. 15 (emphasis added). The Plan does not provide for the retention by Senior Noteholders of their security interests in nearly all of the Debtors' assets or adequate protection liens that have been granted by the Court.

14. Nevertheless, the Plan provides for a distribution to Subordinated Noteholders. Specifically, under the Plan, the Debtors propose the following treatment for Subordinated Noteholders' claims:

> The Old Senior Subordinated Note Claims are hereby allowed in
> the aggregate principal amount of $105,611,111.11. On the
> Effective Date, each holder of an Allowed Old Senior
> Subordinated Note Claim will receive in respect of such Allowed
> Claim against all of the Debtors its Pro Rata share of
> approximately 2,928,571 shares of New Common Stock.

Plan at § III.C.3, p. 15. The Plan also provides that the property to be distributed to Subordinated Noteholders will pass through the Subordinated Notes Trustee's hands. Plan at §

VI.D, p. 25.

15. The Plan does not provide any mechanism for the turnover by the Subordinated Notes Trustee of distributions made for the benefit of Subordinated Noteholders to holders of Senior Indebtedness (or a disbursing agent on their behalf), including the Senior Notes, to the extent necessary to pay such Senior Indebtedness in full in cash. Thus, the Plan fails to enforce the Senior Noteholders' rights under the Subordination Provisions, including, without limitation, their right to have all obligations owed to them (including the Early Prepayment Premium and the Default Rate of Interest) paid in full in cash prior to any distributions to Subordinated Noteholders, and their right to turnover by the Subordinated Notes Trustee of any distributions made in contravention of that right.

16. In addition, while the Plan has been amended from the earlier filed version to modify a provision purporting to enjoin Senior Noteholders from enforcing the Subordination Provisions, it still requires them to pursue what could be costly and lengthy litigation to avail themselves of those rights. Plan at § XI.C.4, p. 34 (Senior Noteholders' rights under the Subordinated Notes Indenture are preserved "solely with respect to and for purposes of the litigation contemplated by the Litigation Reserve Option"). Those Senior Noteholders who do not choose to pursue that litigation lose their subordination rights. Plan at §§ XI.C.1 & XI.C.2, p.33.

17. In the Proposed Disclosure Statement, the Debtors do not even attempt to justify this wholly impermissible disregard of Senior Noteholders' rights under their Plan. Instead, all that they say is that the "Debtors believe that the treatment of the Old Senior Secured Note Claims under the Plan is appropriate and in the best interests of the Estates." Proposed Disclosure Statement at p. 33.

### III. OBJECTIONS

**A.     The Proposed Disclosure Statement Describes a Patently Unconfirmable Plan.**

18. Courts in this Circuit and others have almost uniformly denied approval of disclosure statements that describe proposed plans of reorganization that are unconfirmable on

Exhibit A

their faces. *E.g., In re Phoenix Petroleum,* 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage which could otherwise be raised at confirmation, if the described plan is fatally flawed so that confirmation would not be possible ...."); *In re Curtis Center Ltd. Partnership,* 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("the Court notes its agreement with the proposition that a disclosure statement should be disapproved where the plan it describes is patently unconfirmable"); *In re Market Square Inn, Inc.,* 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."); *In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved."); *see also Collier on Bankruptcy,* ¶ 1125.03[5] (15th ed. 2003) ("most courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable on its face").

19. Courts do so to avoid the waste of time and money of soliciting votes on a plan that has no hope of confirmation. As one court noted:

> The approval of a disclosure statement by a bankruptcy court is an early step in the confirmation process, followed by time consuming and expensive solicitation procedures and confirmation hearings. Having found patent legal defects in the Amended Plan rendering it not confirmable, the Court denies approval of the Debtor's first amended disclosure statement. A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation.

*In re 266 Washington Assocs.,* 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *see also In re Valrico Square Ltd. Partnership,* 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.") Here, approval of the Proposed Disclosure Statement and the solicitation of acceptances of the Plan would be such a wasteful and fruitless exercise.

*(i)    The Plan Fails to Comply With Section 510(a).*

20. Section 510(a) of the Bankruptcy Code provides that a "subordination agreement

is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). The Subordinated Notes Indenture is governed by New York law, which enforces commercial contracts in accordance with their unambiguous terms. Subordinated Notes Indenture at § 12.08, p. 101; *see, e.g., Breed v. Ins. Co. of North America,* 46 N.Y.2d 351, 355 (1978); *Goldberg v. South East Partners Corp (In re Sturman),* 222 B.R. 694, 706 (Bankr. S.D.N.Y. 1998); 22 NY Jur. CONTRACTS § 214 (2003). Thus, Senior Noteholders are entitled to all of the benefits of the Subordination Provisions, including payment of the Early Prepayment Premium and interest at the Default Rate of Interest in cash, before any distributions are made to Subordinated Noteholders. The Plan fails to enforce fully the Subordination Provisions, instead offering to Senior Noteholders a choice between (i) accepting only a fraction of the Early Prepayment Premium and foregoing the Default Rate of Interest altogether, or (ii) having to litigate their entitlement to greater recoveries from the Debtors (which, even if successful, would not result in recoveries to which Senior Noteholders are entitled),[1] all while new common stock is distributed to Subordinated Noteholders.

21.     Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if all of the following requirements are met: (1) The plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). A plan that fails to enforce a subordination agreement in accordance with Section 510(a) fails to satisfy the requirement under Section 1129(a)(1) and is, therefore, unconfirmable. *In re Envirodyne Indus., Inc.,* 1993 Bankr. LEXIS 2224, at *8 (Bankr. N.D. Ill. Dec. 13, 1993) (enforcement of subordination provisions "is not only proper, but required under § 510(a) and § 1129(a)(1)"); *In re Best Prods. Co,* 168 B.R. 35, 68 (Bankr. S.D.N.Y. 1994) (same); *see also In re PWS Holding Corp.,* 228 F.3d 224, 243-45 (3d

---

[1]    For example, even if a Senior Noteholder were successful in pursuing the Litigation Reserve Option, the Plan strips away post-Effective Date interest that would otherwise accrue under the Senior Notes Purchase Agreement (and that would otherwise be subject to the Subordination Provisions). Plan at § III.C.1, p. 15.

Cir. 2000). Furthermore, the Plan's failure to enforce the Subordination Provisions is not a defect that can be cured by a favorable creditor vote (even if that were possible, which it is not given the Ad Hoc Committee's holdings of Senior Notes). Thus, the Plan cannot be confirmed and the Proposed Disclosure Statement should not be approved.

22. Furthermore, the Plan attempts to extinguish the subordination rights of all Senior Noteholders who do not pursue the Litigation Reserve Option. Plan at §§ XI.C.1, XI.C.2 & XI.C.4, pp. 33-34. Even for those Senior Noteholders who do pursue the Litigation Reserve Option, they can avail themselves of their subordination rights only by pursuing (and funding) what could prove to be costly and lengthy litigation. This attempt to curtail the Senior Noteholders' subordination rights represents yet a further violation of the Bankruptcy Code.

*(ii) The Plan Cannot be "Crammed Down" on Class 3.*

23. Even if the Plan were otherwise confirmable (which, as set forth above, it is not), it could not be confirmed in the face of a negative vote of Class 3. The members of the Ad Hoc Committee hold, or advise holders of, over 75% of the Senior Notes and, thus, have the ability to block acceptance of the Plan by Class 3. *See* 11 U.S.C. § 1126(c). If the Proposed Disclosure Statement is approved, and acceptances of the Plan solicited, the members of the Ad Hoc Committee intend to vote to reject the Plan. In that event (and, again, assuming that the Plan were otherwise confirmable), the Plan could be confirmed only if the Plan complied with the "cram down" standards applicable to Class 3 under Section 1129(b) of the Bankruptcy Code.

24. As an preliminary matter and notwithstanding the Proposed Disclosure Statement's demonstrably false statements to the contrary, the Plan does not provide for the possibility of 100% recoveries by Senior Noteholders, under either option offered to them under the Plan. *See* Proposed Disclosure Statement at p. 9 & Exh. IV, p. 3. As to the first option (cash in the amount of 104% of the original principal amount of Senior Notes plus interest at the non-default rate), the Plan fails to provide for, among other things, (i) payment of the full Early Prepayment Premium (18% versus the 4% offered in the Plan) on the full principal amount (as opposed to "original" principal amount) of Senior Notes outstanding, and (ii) payment of the

Exhibit A

Default Rate of Interest (2% higher than the otherwise applicable interest rate).[2]

25. Similarly, the Litigation Reserve Option offered to Senior Noteholders fails to provide for payment in full of Senior Noteholders' claims because, among other things, even if a Senior Noteholder succeeded fully in pursuing that option, (i) it would be at potentially great personal expense, (ii) any distribution would be delayed (possibly substantially) beyond the Effective Date of the Plan, (iii) it would not receive any post-Effective Date interest, and (iv) perhaps most significantly, there is no mechanism under the Plan to ensure that the reorganized Debtors will have the funds necessary to satisfy the Senior Noteholder's claim (instead, only "some mechanism" to be determined and over which the Senior Noteholders have no say).

26. Having failed to satisfy the Senior Noteholders' claims in full and treated them as impaired under the Plan, the Debtors have failed to provide for any treatment that would satisfy the applicable requirements for "fair and equitable" treatment of the Senior Noteholders' claims (which are secured claims) set out in Section 1129(b)(2)(A) of the Bankruptcy Code. For example, they do not provide for the Senior Noteholders' retention of any of their liens (Section 1129(b)(2)(A)(i)) or provide Senior Noteholders with the "indubitable equivalent" of their claims (Section 1129(b)(2)(A)(iii)). Thus, the Plan could not be confirmed over the rejection of the Plan by Class 3, which is assured given the holdings of Senior Notes by members of the Ad Hoc Committee, and the Proposed Disclosure Statement should not be approved.

**B. The Proposed Disclosure Statement Fails to Provide Adequate Disclosure With Respect to Senior Noteholders' Claims and Their Treatment Under the Plan.**

27. Section 1125(b) of the Bankruptcy Code vests this Court with an independent duty to determine whether the Proposed Disclosure Statement contains "adequate information."

---

[2] Both the Early Prepayment Premium and the Default Rate of Interest are fully enforceable and allowable against the Debtors under applicable law (aside from the Senior Noteholders' entitlement to such amounts from Subordinated Noteholders pursuant to the Subordination Provisions). While the Ad Hoc Committee intends to address and, if necessary, litigate their entitlement to such portions of their claims at the appropriate time in these chapter 11 cases, what matters for purposes of this Objection is that (i) the Debtors themselves treat Class 3 as impaired, and (ii) the Plan cannot be crammed down on Class 3.

11 U.S.C. § 1125(b). "Adequate information" means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan ...." 11 U.S.C. § 1125(a)(1). "[I]t is understood that the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan." *Phoenix Petroleum*, 278 B.R. at 393.

28.     Notwithstanding that the Plan represents a significant curtailment of the Senior Noteholders' rights under the Senior Notes Purchase Agreement, the Subordination Provisions of the Subordinated Notes Indenture, and other governing documents, the Proposed Disclosure Statement provides virtually no disclosure regarding distributions to which Senior Noteholders are entitled and, therefore, that which is being taken from them under the Plan. Instead, all that the Proposed Disclosure Statement does is to attempt to deceive Senior Noteholders into believing that they could receive 100% recoveries in reliance upon the Debtors' belief that the treatment of their claims under the Plan "is appropriate and in the best interests of the Estates." Proposed Disclosure Statement at pp. 9 & 33. Even worse, the Debtors' Liquidation Analysis misleads Senior Noteholders who elect not to pursue the Litigation Reserve Option into believing that they will receive "100% recovery under the Plan **plus a $3 million premium**," as opposed to a significant reduction in the distributions to which they are entitled. Proposed Disclosure Statement at Exh. IV, p. 3 (emphasis added). All of this false and misleading disclosure should be deleted from the Proposed Disclosure Statement, and it should be amended to include the following disclosure:

- A complete description (or reproduction) of the Subordination Provisions.

- A complete description of the Early Prepayment Premium (including that it represents 18% of the outstanding principal amount of Senior Notes, which includes Senior Notes representing PIK interest, versus the 4% of "original" principal amount offered in the Plan) and the Default Rate of Interest (including that it exceeds the otherwise applicable

interest rate by 2% per annum).

- A statement that, to the extent any amounts owed to Senior Noteholders (including the Early Prepayment Premium and interest at the Default Rate of Interest) are not satisfied in full in cash by the Debtors, the Senior Noteholders are entitled to receive such amounts from distributions that would otherwise be made to Subordinated Noteholders under the Plan.

- An accurate estimate of recoveries Senior Noteholders can expect to receive under the Plan (taking into account their entitlement to the Early Prepayment Premium, pre- and post-petition interest at the Default Rate of Interest and all other amounts owed under the Senior Notes and governing documents).

- A clear statement that, even if a Senior Noteholder is successful in pursuing the Litigation Reserve Option, (i) such litigation will be at the Senior Noteholder's personal expense, which could be significant, (ii) any distributions to such Senior Noteholder would be delayed pending the disposition of the litigation, which could take many months or even years, (iii) in no event would the successful Senior Noteholder receive post-Effective Date interest (at all, let alone at the Default Rate of Interest) to which it was otherwise entitled under the governing documents, and (iv) there would be no assurance that the reorganized Debtors would have sufficient funds to satisfy such Senior Noteholder's claim.

- A detailed description of how the Debtors expect to satisfy the claims of Senior Noteholders who successfully pursue the Litigation Reserve Option. All that the Proposed Disclosure Statement and Plan say with respect to the amounts necessary to satisfy such claims is that they "will be guaranteed by an increase in the Rights Offering, a new rights offering or some other mechanism (other than the incurrence of debt by the Reorganized Debtors) that is mutually acceptable to the Debtors, the Reorganized Debtors and the Creditors' Committee." Proposed Disclosure Statement at p. 9; Plan at § III.C.1, p. 15. In the absence of an adequate mechanism, and adequate description of that mechanism in the Proposed Disclosure Statement, a Senior Noteholder's "choice" of treatments under the Plan is merely illusory.

- An amendment of the Debtors' projected financial information to reflect the successful pursuit of the Litigation Reserve Option by some or all of the Senior Noteholders. At present, it does not appear that such information reflects payment of the full Early Prepayment Premium or Default Rate of Interest to any Senior Noteholders. The projections (and related notes) should be amended to reflect the successful pursuit of the Litigation Reserve Option by all Senior Noteholders, and possibly a range of results over an assumed range of percentages of Senior Notes with respect to which the Litigation Reserve Option was pursued.

**Exhibit A**

29. In addition, given the patent unconfirmability of the Plan, the certain rejection of the Plan by Class 3, and the inability of the Debtors to "cram down" the Plan on Class 3, the following additional disclosures and amendments to the Proposed Disclosure Statement should be made:

- The Plan violates Section 510(a) of the Bankruptcy Code because it does not fully effectuate the Subordination Provisions. Thus, the Plan cannot be confirmed.

- The Plan's attempt to enjoin Senior Noteholders who do not pursue the Litigation Reserve Option from enforcing their subordination rights against the Subordinated Noteholders and the Subordinated Notes Trustee violates applicable bankruptcy law. Thus, the Plan cannot be confirmed.

- The members of the Ad Hoc Committee hold, or act as investment advisors to holders of, over 75% of the Senior Notes and intend to vote to reject the Plan and thereby block acceptance of the Plan by Class 3. Furthermore, the Plan cannot be confirmed over a negative vote of Class 3 because it fails to satisfy the preconditions for "cram down" under Section 1129(b) of the Bankruptcy Code by, among other things, failing to provide for the retention of liens by Senior Noteholders until they are paid in full. Thus, it is certain that the Plan will not, and cannot, be confirmed.
- The risk factor contained in the Proposed Disclosure Statement (at p. 98) entitled "Non-Confirmation of the Plan" should be revised to state that, for the reasons set forth above, non-confirmation of the Plan is a certainty, rather than merely a risk.

30. Finally, the Proposed Disclosure Statement does not indicate why the Plan has not been amended to provide a mechanism for payment of the fees and expenses of counsel to the predecessor to the Ad Hoc Committee, as counsel to the Debtors announced that it would be in open court on April 28, 2004.

## IV. CONCLUSION

31. Because the Proposed Disclosure Statement describes a patently unconfirmable plan and because it fails to provide "adequate information," within the meaning of Section 1125 of the Bankruptcy Code, to Senior Noteholders and others entitled to vote on the Plan, the Court should deny its approval.

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests

that the Court deny approval of the Proposed Disclosure Statement, and grant such other and further relief as is just and proper.

July 16, 2004

_____
David M. Fournier (DE No. 2812)
James C. Carignan (DE No. 4230)
PEPPER HAMILTON LLP
Suite 5100, Hercules Plaza
1313 North Market Street
Wilmington, Delaware 19801
(302) 777-6500 (Telephone)
(302) 421-8390 (Facsimile)

--and--

Bruce Bennett, Esq.
A. Brent Truitt, Esq. (admitted in N.Y. and D.C. only, and *pro hac vice*)
HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
(213) 694-1200 (Telephone)
(213) 694-1234 (Facsimile)

*Attorneys for The Ad Hoc Committee of Senior Secured Noteholders of Oglebay Norton Company*