IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ONCO INVESTMENT COMPANY, | ) | Jointly Administered under |
| et al., | ) | Case No. 04-10558 |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| MW POST PORTFOLIO FUND | ) | |
| LTD., et al., | ) | |
| | ) | |
| Appellants, | ) | Adversary No. 04-54122(JBR) |
| | ) | |
| v. | ) | Civ. No. 04-1543-SLR |
| | ) | Consolidated Appeal |
| NORWEST BANK MINNESOTA, | ) | |
| NATIONAL ASSOCIATION (n/k/a | ) | |
| WELLS FARGO BANK, MN, | ) | |
| NATIONAL ASSOCIATION), | ) | |
| OGLEBAY NORTON COMPANY, and | ) | |
| THE DEPOSITORY TRUST COMPANY, | ) | |
| | ) | |
| Appellees. | ) | |


**MEMORANDUM ORDER**


At Wilmington this 29th day of September, 2005, having

reviewed the motion to dismiss filed by appellees and the papers

filed in connection therewith;

IT IS ORDERED that said motion (D.I. 10) is granted, for the

reasons stated below.

1. **Introduction.**  Pending before the court are four appeals

filed by plaintiffs-appellants from orders entered by the United

States Bankruptcy Court for the District of Delaware in the above

referenced adversary proceeding.  Appellants are some of the
holders of Senior Notes issued by defendant/appellee Oglebay
Norton Company ("debtor")[1] in October 2002 in the aggregate
principal amount of $75 million which were due October 2008 ("the
Senior Notes").  (D.I. 15, ex. J)  Defendant/appellee Wells Fargo
Bank, MN, National Association ("Wells Fargo") was the Indenture
Trustee under an Indenture dated February 1, 2004 ("the
Indenture") between debtor (as issuer), Wells Fargo (as Indenture
Trustee), and certain guarantors named therein, pursuant to which
debtor issued 10% Senior Subordinated Notes in the aggregate
principal amount of $100 million, due February 1, 2009 ("the
Subordinated Notes").  (D.I. 15, ex. G)  Defendant/appellee The
Depository Trust Company ("DTC") is a limited purpose trust
company designated to be the disbursing agent with respect to the
Subordinated Note Holders.  This court has jurisdiction to hear
this matter pursuant to 28 U.S.C. § 158(a).

2. **Background.**  Oglebay commenced its chapter 11 cases in
February 2004.  Prior to the filing, Oglebay was current in its
payment of principal and interest on the Senior Notes.  The
filing of the bankruptcy petitions, however, constituted a
technical default under the Senior Notes Purchase Agreement,

---

[1]Although there are multiple debtors whose chapter 11 cases
were jointly administered in the above captioned bankruptcy case,
for purposes of this proceeding, only one debtor will be
referenced, the named defendant in the adversary proceeding,
Oglebay Norton Company.

2

resulting in the automatic acceleration of Oglebay's obligations thereunder.  Appellants claim that, as a result of the default and acceleration of the debt, in addition to the entire unpaid principal amount of the Senior Notes, they are also entitled to be paid (a) a prepayment premium in an amount equal to 18% of the original principal amount of the Senior Notes ("the Early Prepayment Premium") and (b) post-petition interest at a higher, default rate ("the Default Rate of Interest").

3.  Oglebay filed its original plan of reorganization on April 27, 2004 and its first amended plan of reorganization on July 1, 2004.  Under the first amended plan, the Senior Note Holders were given the option of accepting either 104% of the principal amount plus interest at a non-default rate, or else participating in a litigation reserve through which the Senior Note Holders were entitled to litigate their entitlement to the Early Prepayment Premium or Default Rate of Interest.  The first amended plan also provided that distributions to Subordinated Note Holders would be made to Wells Fargo as the Indenture Trustee.  (D.I. 15, ex. M)  On June 24, 2004, appellants initiated the above referenced adversary proceeding to contest what they understood their treatment would be under the first amended plan; they filed a motion for summary judgment on July 22, 2004.  (D.I. 15, exs. L, O)

4.  On July 30, 2004, Oglebay filed a second amended plan of

3

reorganization ("the Plan").  (D.I. 15, ex. H)  The Plan
(modified in September and November 2004) was ultimately approved
by creditors and confirmed by the bankruptcy court.  According to
the provisions of the Plan, the claims of the Senior Note Holders
were classified as Class 3 Claims; on the "Effective Date", the
Senior Notes would be "reinstated" pursuant to 11 U.S.C. §
1124(2).[2]  The Plan went on to provide that, on or after October
25, 2004, Oglebay would exercise its redemption rights under the
Senior Notes Purchase Agreement and redeem the Senior Notes in

---

[2]Section 1124(2) provides as follows:

Except as provided in section 1123(a)(4) of this
title, a class of claims or interests is impaired under
a plan unless, with respect to each claim or interest of
such class, the plan -
(2) notwithstanding any contractual provision or
applicable law that entitles the holder of such claim or
interest to demand or receive accelerated payment of
such claim or interest after the occurrence of a default -
(A) cures any such default that occurred before
or after the commencement of the case under this title,
other than a default of a kind specified in section
365(b)(2) of this title;
(B) reinstates the maturity of such claim or
interest as such maturity existed before such default;
(C) compensates the holder of such claim or
interest for any damages incurred as a result of any
reasonable reliance by such holder on such contractual
provision or such applicable law; and
(D) does not otherwise alter the legal, equitable,
or contractual rights to which such claim or interest
entitles the holder of such claim or interest.

full with a cash payment of 106% of the principal amount of the
Senior Notes, plus all accrued and unpaid interest thereon at the
non-default rate through the date of such payment, consistent
with the terms of the Senior Notes Purchase Agreement.[3]

5.   The Plan further classified the claims of the
Subordinated Note Holders as Class 7 Claims.  These claims were
deemed impaired under the Plan and the Subordinated Notes were
converted into equity having a value equal to 24% of the
underlying indebtedness.  The Plan provided that, on the
"Effective Date", the reorganized debtors would distribute new
common stock to DTC; DTC, in accordance with its SEC-approved
rules, would then allocate the distributions to those of its
participants who had an entitlement under the Plan to receive
such.

6.   On August 9, 2004, appellants filed an amended complaint

---

[3]Consistent with § 1124 and as explained in the disclosure
statement approved by the bankruptcy court:
>    Under the Plan, the [Senior Notes] will be
>    Reinstated on the Effective Date, pursuant to section
>    1124(2) of the Bankruptcy Code and Section I.A.91b of
>    the Plan.  Specifically, (a) section 1124(2) of the
>    Bankruptcy Code and Section I.A.91b of the Plan permit
>    the Debtors to Reinstate debt obligations, such as the
>    [Senior Notes], which, among other things, **de-accelerates
>    the debt, cures all defaults and reinstates the original
>    terms and maturity** and (b) the terms of the [Senior Notes
>    Purchase Agreement] permit the Debtors to redeem the
>    [Senior Notes] on or after October 25, 2004 for a
>    prepayment premium of 6%.

(D.I. 15, ex. P at 26)(emphasis added).

5

in the adversary proceeding, and filed as well an amended motion
for summary judgment against Oglebay and Wells Fargo.  (D.I. 15,
exs. E, K, Q)  Appellants asserted therein that, pursuant to the
subordination provisions in the Indenture, the Subordinated Note
Holders were not entitled to any distributions under the Plan
until the Senior Note Holders had been paid - out of the
consideration distributed to Subordinated Note Holders - both the
Early Prepayment Premium and the Default Interest Rate
(notwithstanding reinstatement of the Senior Notes by Oglebay
through the Plan).  The amended complaint sought three forms of
relief:  (a) a declaration against all defendants that no
distributions may be made to Subordinated Note Holders under the
Plan unless and until all Senior Note Holders "have been paid in
full in cash all amounts owed to them under the Senior Notes"
including, without limitation, principal, the Early Prepayment
Premium and the Default Rate of Interest; (b) turnover from the
Indenture Trustee and/or DTC of any amounts received from Oglebay
for the benefit of the Subordinated Note Holders until all
obligations allegedly owed to Senior Note Holders had been paid
in full in cash; and (c) damages from the Indenture Trustee
and/or DTC in the event they received any distributions under the
Plan for the benefit of Subordinated Note Holders but failed to
turn them over to the Senior Note Holders.  (D.I. 15, ex. E at ¶¶
56-65)

7.  Wells Fargo asserted six counterclaims against appellants and a cross-claim against Oglebay.  (D.I. 15, ex. F at ¶¶ 127-138)  The appellees filed their respective oppositions to appellants' motion for summary judgment; both Wells Fargo and DTC filed cross-motions for summary judgment against appellants. (D.I. 15, exs. I, S, T, W)  While these motions were pending, on September 17, 2004, appellants filed a written objection to confirmation of the Plan, arguing that, pursuant to the subordination provisions in the Indenture, the Subordinated Note Holders should not be permitted to receive any distributions under the Plan until the Senior Note Holders were paid the Early Prepayment Premium and the Default Interest Rate (notwithstanding reinstatement by Oglebay).  (D.I. 15, ex. Y)

8.  On September 27, 2004, the bankruptcy court issued its opinion and orders granting Wells Fargo's motion for summary judgment and denying appellants' motion for summary judgment. (D.I. 15, exs. A-B, Z)  In its decision, the bankruptcy court noted that the parties' dispute involved whether the subordination provisions created a right for the Senior Note Holders to recover "a debt no longer owed by" Oglebay.  (D.I. 15, ex. Z at 6)  The bankruptcy court concluded that the intended effect of reinstatement under § 1124(2) was to "roll back the clock to the time before the default existed" "as to all parties and for all purposes."  (Id. at 7-8)

7

9.  The chapter 11 case continued to proceed toward confirmation while the cross-motions for summary judgment were being litigated in the adversary proceeding.  At the confirmation hearing held on October 5, 2004, the bankruptcy court stated on the record that it was overruling appellants' objections to confirmation, "[f]or the reasons set forth in [its September 27] memorandum of decision on [appellants'] summary judgment in the adversary proceedings, and on Wells Fargo's cross motion for summary judgment entered on the docket in the adversary proceeding. . . ."  (D.I. 15, ex. AA at 109-110)

10.  On October 11, 2004, appellants filed opposition to DTC's cross-motion to dismiss the adversary proceeding.  (D.I. 15, ex. BB)  The bankruptcy court issued a memorandum decision and two orders on November 15, 2004 granting DTC relief.  (D.I. 15, exs. C, D, GG)  More specifically, the bankruptcy court explained:

> The Plaintiffs allege that DTC must turn over to them all distributions received by DTC on account of the so-called Subordinated Notes until the Plaintiffs' Senior Secured Notes are paid in full, including what they describe as the Early Prepayment Premium and the interest calculated at the "Default Rate."  The responsibility to turn over the distribution arises from the agreements including the Subordination Agreement.  This Court has previously determined that the Plaintiffs' right to payment, if the claim is reinstated and paid in full as proposed by the Debtors' Plan of Reorganization, does not include the right to collect either the Early Prepayment Penalty or Default rate of interest. . . .  Consequently, the claim against DTC, which arises only from an alleged liability which the Court determined does not exist, cannot stand.

(D.I. 15, ex. GG at 2)

11.   The bankruptcy court entered the Confirmation Order on November 17, 2004.  The Order overruled appellants' objections to the Plan "in their entirety and on their merits" and directed the parties to effect distributions to creditors in accordance with the terms of the Plan.  (D.I. 15, ex. EE at 14, 22)  On November 24, 2004, appellants filed their notices of appeal from all four orders entered in the adversary proceeding.  Appellants did not seek a stay of or appeal from the Confirmation Order, which became final and non-appealable on November 27, 2004.

12.   On January 31, 2005, the Effective Date, the Plan was consummated.  The Subordinated Notes were cancelled and distributions of New Common Stock were made to Subordinated Note Holders through DTC.  Since the Effective Date, the New Common Stock that was distributed for the benefit of the Subordinated Note Holders has been traded on the over-the-counter market for unlisted securities and is being held by various institutions in street name.  (D.I. 13, 14)

13.   Pursuant to the Plan, the Indenture was cancelled on the Effective Date, except to the extent that Oglebay's indemnification obligations to the Indenture Trustee will survive until final resolution of the adversary proceeding.  (D.I. 15, ex. H at § IV.G.1)  As expressly provided in the Plan, the Indenture Trustee has no further duties or obligations with

9

respect to distributions to or for the benefit of the
Subordinated Note Holders.

14.  Of significance to the dispute at bar, the Plan
provided the following:

> Notwithstanding anything to the contrary contained
> in this Section XI.C, any and all rights, arguments and
> defenses relating to the subordination provisions
> contained in the Old Senior Subordinated Note Indenture
> are expressly preserved solely for the holders of Class
> 3 Claims and Class 7 Claims, the Debtors, the Reorganized
> Debtors, the Indenture Trustee and the Creditors'
> Committee and **shall be enforced in accordance with a
> Final Order of the Bankruptcy Court resolving the parties'
> respective rights under such subordination provisions.**

(D.I. 15, ex. H at § XI.C.4)(emphasis added)  "Final Order" is
defined in the Plan as an order or judgment "as to which any
appeal that has been taken or any petition for certiorari that
has been timely filed has been withdrawn or resolved by the
highest court or which the order or judgment was appealed or from
which certiorari was sought."  (D.I. 15, ex. H at § I.A.40)

15.  **Analysis.**  Appellees move for dismissal of the appeals
on several grounds.  In the first instance, the court agrees with
appellants that the appeals are from final orders, as required by
Third Circuit precedent.  Although the bankruptcy court did not
resolve all of the claims of all of the parties by virtue of the
orders in dispute, it is evident from the record that the
bankruptcy court does not intend to do so and, instead, "has
divested itself of the case entirely," thus giving finality to
the appeals.   See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d

189, 198 n.3 (3d Cir. 2001).

16.  Nevertheless, the court lacks subject matter jurisdiction over the appeals, as the events that have occurred, both during and after consummation of the Plan, have rendered appellants' claims constitutionally moot.  Constitutional mootness is a jurisdictional doctrine rooted in the requirement of Article III of the United States Constitution that "the exercise of judicial power depends upon the existence of a case or controversy."  Int'l Broth. of Boilermakers v. Kelly, 815 F.2d 912, 914 (3d Cir. 1987).  Thus, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed."  Church of Scientology v. United States, 506 U.S. 9, 12 (1992)(quoting Mills v. Green, 159 U.S. 651, 653 (1895)).  See also Whiting v. Krassner, 391 F.3d 540, 544 (3d Cir. 2004)(claims become moot whenever "'changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.'")(quoting Jersey Cent. Power & Light Co. v. New Jersey, 772 F.2d 35, 39 (3d Cir. 1985)).  The question that must be determined, therefore, is whether events have occurred since the commencement of litigation that have foreclosed the granting of any effective relief to appellants.

17.  The court concludes that dismissal on the grounds of

mootness is required.  In their amended complaint, appellants
sought three forms of relief against the named defendants:
declaratory relief against all defendants, turnover relief
against Wells Fargo (as Indenture Trustee) and DTC, and money
damages against Wells Fargo and DTC.  Such relief is no longer
available against these defendants.[4]

     a.  In their first claim for relief in the amended
complaint, appellants sought a declaration that "no distributions
may be made by any of the Debtors, under a plan of reorganization
or otherwise, to any Subordinated Noteholder or the Subordinated
Notes Trustee . . . unless and until Senior Noteholders have been
paid in full in cash all amounts owed to them under the Senior
Notes, including, without limitation, principal, the Early
Prepayment Premium, and unpaid pre- and post-petition interest,
including interest at the Default Rate of Interest. . . ."  (D.I.
15, ex. E at § 57)  Of course, such distributions have been made,
pursuant to a Plan and final Confirmation Order.  Because this
particular form of relief is no longer attainable, there no
longer is a justiciable controversy.

     b.  In their second and fourth claims for relief,

_____

    [4]The court agrees with appellants that the relief sought in
the form of damages would not "unravel" the Plan and make the
appeals constitutionally moot.  Rather, the lack of a justiciable
controversy flows from the way the litigation was framed - who
was sued and under what (if any) theory of recovery - given the
events that occurred in connection with the underlying bankruptcy
proceeding.

appellants sought judgment against Wells Fargo and DTC requiring them to "turn over any property received from the Debtors for the benefit of any Subordinated Noteholder, under a plan of reorganization or otherwise, to [appellants] to the extent necessary to pay in full in cash all amounts owed to [appellants] under the Senior Notes, including, without limitation, principal, the Early Prepayment Premium, and unpaid pre- and post-petition interest, including interest at the Default Rate of Interest . . . ." (D.I. 15, ex. E at §§ 59, 63)  Wells Fargo, as the Indenture Trustee, was taken out of the distribution chain in the Plan; appellants have conceded in this regard that, "[i]f the Subordinated Notes Trustee never receives any property from the Debtors, it will have nothing to turn over to the Senior Noteholders." (D.I. 15, ex. R at 22)  Such is the case.  As to DTC, under the Plan and Confirmation Order, DTC was expressly directed to, and in fact did, distribute the New Common Stock to those of its participants who had accounts for the beneficial holders of the Subordinated Notes on the Effective Date.  The record indicates that DTC completed its task and presently has no property to turn over to appellants, thus mooting the turnover claim against DTC.

          c.  In their third and fifth claims for relief, appellants sought damages against Wells Fargo and DTC "in the amount of the value of any property received from the Debtors on

account of the Subordinated Notes." Again, because Wells Fargo, as the Indenture Trustee, never received property under the Plan, appellants cannot seek damages relief from Wells Fargo. (D. I. 15, ex. R at 22) As to DTC, appellants never identified in their amended complaint their theory of recovery against DTC, a securities depository with no interest in the outcome of the chapter 11 case at bar. Under the Plan and Confirmation Order, DTC was directed to allocate the New Common Stock to those of its participants who had deposited the Subordinated Notes (on behalf of the Subordinated Note Holders) at DTC. DTC did so in the ordinary course of its business, and was expressly relieved under the Plan and Confirmation Order of any "liability to any party for actions taken in accordance with the Plan. . . ." (D.I. 15, ex, H at § VI.D.1.b.v) Having never articulated a theory of recovery against DTC, and under the circumstances of record, appellants' damages claim against DTC is nonjusticiable.

18. **Conclusion.** For the reasons stated, IT IS ORDERED that Appellees' motion to dismiss the four appeals of record (D.I. 10) is granted.

_____
United States District Judge

14